## EQUITABLE LIFE ASSURANCE SOCIETY *v.* COMMISSIONER OF INTERNAL REVENUE.

No. 492. Argued March 8, 9, 1944.—Decided March 27, 1944.

*Mr. John L. Grant* for petitioner.

*Mr. Chester T. Lane,* with whom *Solicitor General Fahy, Assistant Attorney General Samuel O. Clark, Jr.,* and *Messrs. Sewall Key, J. Louis Monarch, L. W. Post,* and *Robert L. Stern* were on the brief, for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question in this case is whether petitioner, a mutual life insurance company, was entitled to deduct from its gross income for 1933 "excess interest dividends" paid within that year. The deduction was authorized if the amounts were "interest" paid on "indebtedness" [1] within the meaning of § 203 (a) (8) of the Revenue Act of 1932, 47 Stat. 169, 225. The Tax Court denied the deduction. 44 B. T. A. 293. The Circuit Court of Appeals affirmed. 137 F. 2d 623. The case is here on a petition for a writ of certiorari which we granted because the decision below and *Penn Mutual Life Ins. Co.* v. *Commissioner,* 92 F. 2d 962, from the Third Circuit conflicted with *Commissioner* v. *Lafayette Life Ins. Co.,* 67 F. 2d 209, from the Seventh.

The facts are stipulated and show the following: During and prior to 1933 petitioner issued life insurance policies which gave to the insured (and in some cases to the beneficiary) the right to have petitioner hold the face amount of the policies upon their maturity under one or more of several optional modes of settlement in lieu of

---

[1] This provision of the Act reads in part as follows: "In the case of a life insurance company the term 'net income' means the gross income less . . . All interest paid or accrued within the taxable year on its indebtedness" with exceptions not relevant here.

payment in a lump sum. These optional modes of settlement are exercised under supplementary contracts. Thus one form of supplementary contract provides that the amount of the policy shall be left on deposit with petitioner. And it is provided in case of this, as well as the other types of supplementary contracts which are involved,[2] that "if in any year the Society declares" that funds held under these options shall receive interest in excess of 3% per annum, the payments under them "shall be increased for that year by an Excess Interest Dividend as determined and apportioned by the Society." During the year 1933 some $534,000 of excess interest dividends was paid by petitioner under these supplementary contracts. The amount so paid accrued during the year at the rate which had been declared by petitioner's board of directors at the beginning of that year.

Petitioner's argument runs as follows: Nothing in the supplementary contracts or underlying policies conditions the payment of excess interest dividends on the existence of a surplus. The policies and the statutes authorizing their issuance negative the idea that the payment of these excess interest dividends constitute a distribution of surplus or of earnings of prior years. Petitioner's declaration at the beginning of 1933 that it would pay excess interest dividends in that year at a specific rate constituted an offer. Those who elected in 1933 to keep the funds on deposit, rather than to withdraw the amounts of the policies which had become payable during the year, accepted that offer. It is reasonable to assume that but for the declaration at the beginning of the year the new supplementary contracts would not have been made. In at least some of the cases where the funds were already on

---

[2] The other types of optional settlements involved here are instalment options for a fixed period and instalment options in a fixed amount.

deposit at the beginning of 1933 the beneficiaries could have withdrawn them on demand. By refusing to exercise that right and by leaving the funds on deposit the beneficiaries accepted petitioner's offer. And, it is again asserted, but for the declaration of excess interest dividends, it is reasonable to assume that petitioner would not have been permitted to retain and use those funds during that year. As to funds on deposit at the beginning of 1933 and over which the beneficiaries had no power of withdrawal, the argument is that the original promise to pay the excess interest dividends, though conditional, was a promise to pay "interest." [3]

While these are interesting questions which are propounded, the facts on which most of them turn were not determined by the Tax Court. Its findings of fact did not go beyond the stipulation. And it apparently was not asked to go farther. It based its ruling on *Penn Mutual Life Ins. Co.* v. *Commissioner, supra.* It may be that custom or a course of dealing or other circumstances would warrant findings of fact which would support at least part of the claimed deduction. But more proof is needed than the provisions of the policies and the contents of the stipulation. It is not our task to draw inferences from facts or to supplement stipulated facts. That function rests with the Tax Court. We may modify or reverse the decision of the Tax Court only if it is "not in accordance with law." 44 Stat. 110, 26 U. S. C. § 1141 (c) (1); *Wilmington Trust Co.* v. *Helvering,* 316 U. S. 164; *Dobson* v. *Commissioner,* 320 U. S. 489. We must make our determination on the record before us. If relevant evidence was offered before the Tax Court but rejected by it, we could remand the case to it for appropriate findings. But no such situation is presented here. Accordingly we

---

[3] The amount of funds in each of these three categories does not appear, though petitioner has offered its rough estimates.

can reverse the judgment below only if we can say on the basis of the provisions of policies and the meager stipulation that the excess interest dividends were "interest" within the meaning of the Act[4] as a matter of law.

The "usual import" of the word interest is "the amount which one has contracted to pay for the use of borrowed money." *Old Colony R. Co. v. Commissioner,* 284 U. S. 552, 560; *Deputy v. Du Pont,* 308 U. S. 488, 498. We cannot say as a matter of law that the excess interest dividends fall within that category. They appear to be amounts which may be declared or withheld at the pleasure of the board of directors. An obligation to pay may of course arise after the declaration, the same as in case of dividends on stock. But an obligation to pay declared dividends on stock would hardly qualify as "interest" within the meaning of the Act. The analogy of course is not perfect, as these excess interest dividends may not be payable from surplus or earnings of prior years and the obligation to pay the principal amount under each option was absolute. Yet payments made wholly at the discretion of the company have a degree of contingency which the notion of "interest" ordinarily lacks. If we expanded the meaning of the term to include these excess interest dividends, we would indeed relax the strict rule of construction which has obtained in case of deductions under the various Revenue Acts. *New Colonial Co. v. Helvering,* 292 U. S. 435, 440: *Deputy v.*

---

[4] Sec. 163 (a) of the Revenue Act of 1942, 56 Stat. 798, 868, includes within the definition of "interest paid" the following: "All amounts in the nature of interest, whether or not guaranteed, paid within the taxable year on insurance or annuity contracts (or contracts arising out of insurance or annuity contracts) which do not involve, at the time of payment, life, health, or accident contingencies." The Senate Report points out that this provision was designed to include both guaranteed interest and excess interest dividends. S. Rep. No. 1631, 77th Cong., 2d Sess., pp. 146–147.

*Du Pont, supra,* p. 493. Appropriate findings of fact might well bring such payments within the meaning of "interest," as for example a finding that their declaration was the basis on which new contractual engagements were made. But such is not this case.

*Affirmed.*