**DELTA LIFE INSURANCE COMPANY**

v.

**UNITED STATES of America.**

**Civ. A. No. 71–1632.**

United States District Court,
E. D. Louisiana.

Aug. 28, 1973.

Phillip A. Wittmann and Paul O. H. Pigman, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for plaintiff.

Howard A. Weinberger, Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

JACK M. GORDON, District Judge:

This case involves the proper "life insurance reserve," as defined in Internal Revenue Code Section 801(b), 26 U.S.C. § 801(b) (1970), for purposes of Delta Life Insurance Company's tax liability. Following Delta's payment of a deficiency assessed by the Internal Revenue Service for the tax years of 1964 and 1965, Delta filed a claim for refund with the Service. When the claim was not acted upon within six months, Delta

filed suit against the United States in this Court for the recovery of $188,952.-69 together with interest at the statutory rate. Because the material facts are not disputed, the case is decided through a summary judgment under Rule 56, Federal Rules of Civil Procedure.

The company was incorporated in 1935 as an industrial insurer which engaged in writing funeral service, life, and health and accident insurance policies. Of concern here are the funeral service policies. Most of the funeral service policies have a face value for the "funeral benefit" of $1,500 or less. In lieu thereof the beneficiary on policies issued prior to October 1, 1957, could elect a cash payment amounting to 50 percent of the face value if the policyholder died in the Louisiana parishes of Orleans, Jefferson, and St. Bernard, or a cash payment amounting to 75 percent of the face value if the policyholder died outside Orleans, Jefferson, and St. Bernard Parishes. The terms of the policies issued after October 1, 1957, provided the beneficiary with an election to receive a cash payment amounting to 100 percent of the face value without regard for the place where the policyholder died

Delta computed its reserve for funeral service policies by using standard mortality tables and a 3½ percent interest rate, in compliance with Louisiana state laws, La.R.S. 22:162, subd. A and 162, subd. B, which read as follows:

A. Upon receipt of such report, the commissioner of insurance shall make a valuation of the policies and annuities of each insurer, and shall ascertain the reinsurance reserves and surplus of every such insurer. All such valuations shall be in accordance with the terms of the respective contracts on the net premium basis.

B. The legal minimum standard for such valuation of policies, including industrial life insurance policies, shall be the American Experience Table of Mortality with interest at four per cent per annum, except that group insurance policies under which premium rates are not guaranteed for a period in excess of five years shall be valued on the American Men Ultimate Table of Mortality with interest at three and one-half per cent per annum.

For policies issued while Delta was an industrial insurer, the following state laws of La.R.S. 22:162, subd. E(3) and 162, subd. E(4) required Delta to maintain a reserve of 75 percent of the actuarial computation:

(3) On all policies issued by such insurer on or after January 1, 1947, which provide for the furnishing of a funeral as the obligation of the insurer to the insured and his beneficiary, a reduction not to exceed twenty-five per cent of the reserve as computed in accordance with this Part.

(4) Provided, that in all cases, this reduction shall be allowed only where the insurer produces satisfactory proof of a contract with an authorized funeral director who is capable of furnishing the service specified in the policy, allowing a discount for the furnishing of the service specified therein, and in no case shall the reduction allowed herein exceed the amount of the reduction allowed in such contract.

On October 1, 1957, Delta converted from an industrial insurer to a combination company insuring straight life risks, and the following provision of La. R.S. 22:803 required the company to increase its reserve against policies issued thereafter to 100 percent of the actuarial computation:

Any domestic industrial insurer converting to a type insurer with greater insuring powers may continue to issue industrial policies in accordance with the provisions of this Code governing domestic industrial insurers, except that the provisions of R.S. 22:162E [supra] shall not apply to any policies issued after conversion.

. . .

Beginning January 1, 1956, in anticipation of the conversion, consummated

on October 1, 1957, Delta maintained a 100 percent reserve on policies issued during the interim period from January 1, 1956, until October 1, 1957, even though state law required only a 75 percent reserve against these policies. For policies issued after October 1, 1957, Delta maintained a 100 percent reserve as required by state law.

The salient facts with respect to the policies and reserves may be summarized for each of three periods as follows:

| Date Policy Issued | Cash Option | State Law Requirement | Actual Reserve |
|---|---|---|---|
| Period 1 (Pre-1956) | 50% face value or 75% face value depending on place of death | 75% reserve | 75% reserve |
| Period 2 (Jan. 1, 1956 to Oct. 1, 1957) | 50% face value or 75% face value depending on place of death | 75% reserve | 100% reserve |
| Period 3 (Post-Oct. 1, 1957) | 100% face value | 100% reserve | 100% reserve |

The government alleges certain facts which, for the purpose of this summary judgment, must be presumed correct. *See generally* Gauck v. Meleski, 346 F.2d 433 (5th Cir. 1965). Delta has an arrangement providing discounts as high as 40 percent from certain designated funeral homes. Although the arrangement is not based on long term contracts, the government refers to a history of Delta's obtaining substantial discounts. At least two of the designated funeral homes are controlled by shareholders of Delta. An examination of Delta's payments on policies maturing during 1964 and 1965 reflects that Delta paid an average of 63.52 percent of the face value in discharging its obligations.

The government contends that Delta's reserve for the tax years 1964 and 1965 against outstanding policies should not exceed its cost experience of 63.52 percent of face value. This would reduce the reserve for the first period policies by 11.48 percent, and would reduce the reserve for the second and third period policies by 36.48 percent.

In filing its memorandum contravening plaintiff's motion for summary judgment, the government decided not to take a position with respect to the rectitude of Delta's claim for refund based on a 100 percent reserve against post-October 1, 1957, policies. According to the memorandum, "The reason for this hesitancy is that particularly in the life insurance area policy decisions made by the government and judgments of courts to an amount much greater than ordinary, affect the entire life insurance industry."

Furthermore, the government requested that the decision of this court be deferred until the government appeals a Tax Court decision, Mutual Benefit Life Insurance Company, 58 T.C. 679 (1972), to the Third Circuit. Becuase the *Mutual Benefit* case does not control this case, this Court decided not to delay its decision.

There are five statutory requirements relevant to this case for determining the

section 801(B) "life insurance reserves":

(1) The reserve must be computed or estimated on the basis of recognized morality tables;

(2) The reserve must be calculated by using assumed rates of interest;

(3) The reserve must be set aside to mature or liquidate future unaccrued claims arising from life insurance contracts;

(4) At the time with respect to which the reserve is computed, the contracts must involve life contingencies;

(5) The reserve must be required by state law.

Delta undoubtedly met the first two requirements, for the government concedes that the reserve was computed or estimated on the basis of recognized mortality tables and assumed rates of interest. With respect to the third requirement, the Fifth Circuit has squarely held that a contract providing for a funeral service upon death of a policyholder is a life insurance contract. Lamana-Panno-Fallo Industrial Ins. Co. v. Commissioner, 127 F.2d 56, 59 (5 Cir. 1942); Commissioner v. W. H. Luquire Burial Assn. Co., 102 F.2d 89, 90 (5 Cir. 1939). As the court said in Luquire, 102 F.2d at 90: "The mere fact that the policy is payable not in money, but in something of value equal to money, does not, as a matter of law, exclude it from classification as an insurance contract."

To satisfy the fourth requirement, the contract must involve a life contingency at the time the reserve is computed. It would seem elementary that this requirement is met by virtue of the benefits depending upon the policyholder's death. But the government argues that the beneficiary's option of cash in lieu of services after the death of the policyholder is an added contingency which precludes qualification of Delta's reserve. Without directly linking this argument to any particular case, the government in its memorandum does discuss four early Supreme Court cases:

McCoach v. Insurance Company of North America, 244 U.S. 585, 37 S.Ct. 709, 61 L.Ed. 1333 (1917); Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920); United States v. Boston Insurance Co., 269 U.S. 197, 46 S.Ct. 97, 70 L.Ed. 232 (1925); Helvering v. Inter-Mountain Life Ins. Co., 294 U.S. 686, 55 S.Ct. 572, 79 L.Ed. 1227 (1935). Then the government narrows the statute's requirement that the contract *involve* a death contingency to a requirement that only a death occur, and not a subsequent option in favor of the beneficiary to elect the form of payment.

In *McCoach*, the Supreme Court said that a reserve maintained for accrued but unpaid losses was not a reserve within the scope of the federal statute. *Maryland* considered a similar reserve and reached an opposite result without citing *McCoach*. *Boston Insurance* noted the conflict between the two opinions and reaffirmed *McCoach* while disapproving *Maryland*. Although decided by interpreting different federal statutes than the current tax statute, the cases are consistent with Delta's asserted reserve. *McCoach* and *Boston Insurance* simply said it was improper to maintain a reserve after a claim had been made against the policy, because the contingency for payment had occurred. Delta is not attempting to maintain a reserve after the policyholder's death; rather, Delta is only maintaining reserves against the policies until the contingency of death occurs. Furthermore, the reserve is set aside for the single purpose of meeting policy obligations at maturity, so the reserve satisfies the Supreme Court's concern in New York Life Ins. Co. v. Edwards, 271 U.S. 109, 46 S.Ct. 436, 438, 70 L.Ed. 859 (1926) that the reserve not take into account the company's salary and operating expenses. *See generally* 8 J. Mertens, Law of Federal Income Taxation § 44.30 (J. Malone ed. 1970).

In *Inter-Mountain* the Supreme Court reviewed a life insurance company which had set up two reserves, one represent-

ing obligations contingent upon death of the policyholder and the other against matured, unsurrendered, and unpaid coupons which the policyholder could claim at any time. In denying the second reserve's deductibility, the Supreme Court noted that a life insurance reserve is a special deduction granted by Congress to life insurance companies only, so a qualified reserve should be limited to life insurance elements. The court added in a critical passage:

*Life insurance matures only upon the death of the insured and the life reserve is based upon that contingency,* whereas liability on the matured coupons depends upon no contingency. It follows that the insurance reserves alone constitute the base on which the deduction is to be computed. Reserves against matured coupons are excluded. 294 U.S. at 690, 55 S.Ct. at 575 (emphasis added).

The italicized passage should not be read in isolation. The Supreme Court in the context of the case was contrasting policies maturing at death with mature coupon obligations not involving any contingency at all. Delta's funeral policies certainly pass the *Inter-Mountain* test of maturing at the death of the policyholder. *See generally* 8 Mertens § 44.33.

■ ‧ The fact that the beneficiary chooses the form of payment cannot *per se* disqualify a reserve for the obligation, because as 8 Mertens § 44.34 observed, "Practically all life insurance policies provide optional modes of settlement which may be elected either by the insured or the beneficiary." Cases such as Equitable Life Assur. Soc. of United States v. Commissioner, 321 U.S. 560, 64 S.Ct. 722, 88 L.Ed. 927 (1944), dealing with settlements extending payment over a number of years beyond the policyholder's death, are inapposite here. Delta limits the beneficiary's option to an immediate lump sum cash payment which is equal to or less than the face value of the funeral service. Thus the company does not add any element to the reserve which is attributable to the possible exercise of the option.

The fifth requirement is that the reserve .must be required by state law. Except for the period of January 1, 1956, through October 1, 1957, the government concedes that all other policies were reserved according to the requirements of state law. For the policies issued during the interim period, taxpayer voluntarily increased its reserve from the required 75 percent to 100 percent. Taxpayer relies upon the "philosophy" of Mutual Benefit Life Insurance Company, 58 T.C. 679 (1972), on appeal to the Third Circuit, to justify this additional reserve. This case concerned a company operating under a New Jersey law which permitted, but did not require, the maintenance of an additional reserve. However, the statute further provided that a reserve once increased could not be changed to produce smaller amounts except upon approval by the New Jersey Commissioner of Banking and Insurance. Unlike the law in New Jersey, the law in Louisiana as applied to Delta during the interim period permitted Delta to reduce its reserve from 100 percent ‧to 75 percent. Thus Delta cannot claim that it was required by any force of law to maintain a 100 percent reserve for policies issued during the interim period. Accordingly, taxpayer can obtain a reserve only to the extent of a 75 percent reserve for such policies. *Compare* Lamana-Panno-Fallo Industrial Ins. Co., Inc. v. Commissioner, 127 F.2d 56 (5 Cir. 1942); Mothe Burial Bene. Life Ins. Co. v. Fontenot, 46 F.Supp. 978 (E. D.La.1942); *with* Standard Industrial Life Insurance Co. of Louisiana, 42 B. T.A. 1011 (1940).

■ Delta thus satisfies all five statutory tests for maintaining a reserve of 75 percent on policies issued during the first two periods and a reserve of 100 percent on policies issued during the third period.

This result does not give Delta an undue tax advantage. It is free to arrange its affairs in such a fashion as to minimize the impact of federal income taxation as long as the arrangement has economic substance. Here the company has

profited by using various officially designated funeral homes to help satisfy policy obligations, °and this profit is taxed when the policy matures at the death of the policyholder. The government would have the company anticipate this profit before the policy is mature by disallowing part of the company's reserve. However, this would result in a speculative method of computing reserves against future obligations based on past experience, in violation of state law and contrary to the express federal statutory instruction that the reserve be computed from standard mortality tables. The Internal Revenue Service's own Revenue Ruling 67–435, 1967–2 C.B. 232, 234, emphasized that a reserve should be a function of actuarial calculation and should not reflect changing expense ratios or unfavorable mortality experience. By the same token it would seem fair that the reserve should not reflect favorable company experience.

To use the company's past cost experience of 63.52 percent of face value, as suggested by the government, would result in a reserve of less than the company's potential cash liability. Even with respect to the earlier policies the company can be liable to pay cash for 75 percent of the face value in the event that the policyholder dies outside Orleans, Jefferson, and St. Bernard Parishes. For policies issued after October 1, 1957, the company can be liable to pay cash for 100 percent of the face value. This potential cash liability certainly supplies economic substance to justify a 75 percent reserve against policies issued during the earlier periods and a 100 percent reserve against policies issued in the last period. Furthermore, the company has no assurance that its discount arrangement for funeral services will continue until the policies mature, because the funeral homes may go out of business or raise their rates to keep pace with inflation.

An analogous revenue ruling, Rev.Rul. 70–323, 1970–1 C.B. 152, reviewed a company maintaining a 100 percent reserve despite its having contracts with funeral homes enabling satisfaction of the policy obligations at a 25 percent discount. In ruling that the reserve must be reduced 25 percent, the Service emphasized the *certainty* that the company would pay less than the face amount of the policies as claims. Without passing on the validity or efficacy of the revenue ruling, this Court notes a distinguishing fact in the revenue ruling is that the policies did not provide any option for a cash settlement. In the present case, by comparison, because of the cash option it is not certain that Delta will pay less than the reserve required by Louisiana law.

This Court's decision to allow Delta a reserve of 75 percent for the earlier periods and 100 percent for the last period is consistent with the fundamental tax principles recently enunciated by the Supreme Court. In Commissioner v. First Security Bank of Utah, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), the Commissioner sought to allocate income from an insurance company to a commonly controlled bank which referred applications for insurance. Because it was illegal for the bank to receive the income, the Supreme Court refused to countenance the Commissioner's allocation. The bank simply lacked the requisite power to receive the income. Likewise, Delta lacked the power under state law to maintain a smaller reserve.

Whereas *First Security Bank* involved a *deflection of income between parties* imposed by law, *see* United States v. Basye, 410 U.S. 441, 453, n. 13, 93 S.Ct. 1080, 1087, n. 13, 35 L.Ed.2d 412 (1973), Delta's case here involves a *deflection of the time of income* imposed by law. Delta could not reduce its reserve to 62.5 percent, because it was required by Louisiana law to maintain a larger reserve. Any income which is deferred, as a result of the larger reserve, will be reported when the policies mature.

The parties having stipulated the material facts for rendering judgment pursuant to this Court's decision to allow a tax refund based upon a reserve of 75

percent with respect to policies issued until October 1, 1957, and a reserve of 100 percent for the policies issued after October 1, 1957; accordingly,

It is ordered that summary judgment be entered awarding Delta Life Insurance Company $147,688.44 for the tax year 1964 and $27,170.25 for the tax year 1965, together with interest provided by 26 U.S.C. § 6611 (1970).