594 F.2d 21
 79-1 USTC P 9259
 LIBERTY LIFE INSURANCE COMPANY, Plaintiff-Appellee-Cross-Appellant,
v.
UNITED STATES of America, Defendant-Appellant-Cross-Appellee.
LIBERTY LIFE INSURANCE COMPANY, Plaintiff-Appellant-Cross-Appellee,
v.
UNITED STATES of America, Defendant-Appellee-Cross-Appellant.
 Nos. 77-2161, 77-2162.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 4, 1978.
Decided March 8, 1979.
As Amended March 28, 1979.
 
 David A. Merline, Greenville, S. C., for plaintiff-appellant-cross-appellee in 77-2162 and for plaintiff-appellee-cross-appellant in 77-2161.
 Gary R. Allen, M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and James E. Crowe, Jr., Washington, D. C. (Thomas E. Lydon, Jr., U. S. Atty., Columbia S. C., on brief), for defendant-appellee-cross-appellant in 77-2162 and for defendant-appellant-cross-appellee in 77-2161.
 Before WINTER, Circuit Judge, COWEN,* Senior Judge, and PHILLIPS, Circuit Judge.
 COWEN, Senior Judge:
 
 
 1
 Liberty Life Insurance Company (hereinafter referred to also as plaintiff and taxpayer) is a South Carolina corporation which issues various kinds of insurance. Liberty Life filed a timely United States Life Insurance Company Income Tax Return (form 1120L) for the calendar year 1965 and paid the taxes shown thereon. On March 11, 1971, plaintiff filed a timely claim for refund of some of its 1965 taxes; the Internal Revenue Service disallowed the claim in November of 1971. Following a suit in the district court for a refund of the taxes paid, both parties have appealed to this court from the judgment of that court.
 
 
 2
 Three issues are presented for our determination: (1) whether a portion of a South Carolina graded license fee may be described as an investment expense[1] within the meaning of that term as used in 26 U.S.C. § 804(c)(1); (2) whether a portion of the commissions plaintiff paid to its field representatives may be described as an investment expense under the same section; and (3) whether a discount plaintiff grants to savings and loan associations for yearly payment of a mortgage cancellation insurance premium is a discount "in the nature of interest" within the meaning of 26 U.S.C. § 805(e)(3).[2]
 
 
 3
 The district court decided[3] the second of these issues in favor of plaintiff and on June 14, 1977, entered judgment ordering a refund of $31,587.67 in taxes, plus interest. The Government filed a timely appeal. The other two issues were decided in favor of the Government and the taxpayer duly filed its cross-appeal. We agree with the trial judge's well-drawn findings of fact and with his cogent and enlightening conclusions of law. Therefore, we affirm the judgment of the court below in its entirety.
 
 I. The license fee
 
 4
 The state of South Carolina imposes on all domestic life insurance companies doing business within the state a license fee in an amount determined by the total premium income of the company. Specifically, § 37-130.1 of the Code of Laws of South Carolina (1962) in effect at the time provided that all domestic life insurance companies must pay a graded license fee of 2 percent of their total premium income or total premium receipts from insurance contracts issued to South Carolina residents, or paid from points within the state. The fee is subject to a maximum limitation of 5 percent of the net income of the company from all sources. In 1965, 2 percent of the South Carolina premiums received by Liberty Life amounted to $475,946.42, while 5 percent of its net income was only $222,911.93. Therefore, Liberty Life paid 5 percent of its net income as the graded license fee.
 
 
 5
 Net income includes investment income. Plaintiff reasoned that when the license fee was calculated with reference to net income, it was partly a tax on investment income; accordingly, it deducted 5 percent of its gross investment income (that is, $173,344.75) as an investment expense on its 1965 tax return. The Commissioner disallowed this deduction, and his disallowance was upheld by the district court.
 
 
 6
 The taxpayer makes three arguments in its appeal of this decision. The first is based on the fact that in every year since this statute was passed, Liberty Life has paid 5 percent of its net income rather than 2 percent of its total premium receipts. In order for the premium receipts to be the smaller figure, a life insurance company's net income would have to exceed 40 percent of its gross premium income. Since this was not true for Liberty Life and (it submits) is unlikely to be true for Any normally operated life insurance company, plaintiff argues that the intent of the statute, evidenced by its net effect in practice, must have been to impose a tax based, at least in part, on investment income.
 
 
 7
 The fallacy of this argument is that the statute on its face taxes only premium income, and there is nothing in the legislative history or elsewhere which contradicts the clear language of the law. It would have been a simple matter for the legislature to have levied a tax on net income had it desired to do so. It seems clear to us that the legislature did not so intend. Rather, the intent was to levy a tax on premium income and at the same time to fix a maximum limit for the tax so that it would not take too large a bite out of the net income of the insurance companies. This provision was doubtless intended to provide an incentive for insurance companies to do business in the state. Plaintiff's argument is rejected because we do not believe that the legislature intended to tax net income in such a roundabout way.
 
 
 8
 Second, plaintiff argues that the fee must have been in part a tax on investment income, since but for that income, the fee would have been less. Since the higher tax was occasioned by the inclusion of investment income in net income, says plaintiff, the amount of increase constituted a tax on investment income and should be deductible as an investment expense. This argument, however, is logically defective. The liability imposed by the statute is 2 percent of the gross premium income. The limitation to the 5 percent of net income under the statutory plan is simply a way of calculating how much of that liability the plaintiff actually has to pay. This much is clear from the language of the statute:* * * The additional and graded license fee imposed in this section shall not exceed five per cent of the net income of the company * * *. § 37-130.1, Code of Laws of S.C., 1962.
 
 
 9
 This language does not convert the premium fee into a tax on investment income. The fortuity that the legislature chose a formula which included investment income to determine the maximum limit of the tax does not alter the character of the fee itself.
 
 
 10
 Finally, plaintiff argues that since the fee is by far the largest sum it pays to the state each year, the charge is in reality a tax on the privilege of doing business All business, including investment business in the state. Plaintiff points to a comment in New World Life Ins. Co. v. United States, 88 Ct.Cl. 405, 435n, 26 F.Supp. 444, 459n (1939), Aff'd per curiam 311 U.S. 620, 61 S.Ct. 314, 85 L.Ed. 393 (1940), which suggests that a fee paid to a state for the privilege of doing business there might be apportioned to the investment department of the company.
 
 
 11
 This may be a correct statement of the law when the fee paid is genuinely unsusceptible of allocation to any particular part of the life insurance company's business. If the statute by its terms imposed the fee for the privilege of transacting business within the state, the plaintiff's argument would have some force. But this fee expense appears to be fully allocable. It is a fee based on premium income. The legislature has not chosen to tax (by way of a fee) investment income as well. This is a policy decision with which we need not be concerned, and which does not determine for us the character of the fee which the legislature imposed. Furthermore, as the Government suggests, South Carolina's imposition of an identical fee (2 percent of gross premiums) on foreign life insurance companies (§ 37-122, Code of Laws of S.C. (1962)) is strong evidence, if more were needed, that the tax on premiums is exactly what it appears to be, especially since the foreign companies' fee is not limited to 5 percent of net income.[4]
 
 
 12
 In short, plaintiff's arguments have not convinced us that the South Carolina premium-based license fee is anything other than what it plainly appears to be. Consequently, the district court's holding on this issue is affirmed.
 
 II. The commissions
 
 13
 Like most other insurance companies, Liberty Life issues loans on the security of its customers' insurance policies. Unlike many other insurance companies, the work required to service these loans (explaining the terms of the loans, filling out applications, and collecting the loan payments, for example) is done not by home office employees but by field representatives. The district court found that these representatives spent about 5 percent of their total working time performing loan services.
 
 
 14
 Liberty Life pays its field representatives by commissions, which are calculated by using a number of factors related to the insurance policies they issue. None of these factors depends in any way on the work done in servicing policy loans. Liberty Life assigned dollar values (in amounts found to be reasonable by the trial judge) to the loan services performed by the field representatives and, using these figures, determined the total amount of the field representatives' compensation that was attributable to the loan services. The company then deducted this amount ($238,356) as an investment expense on its 1965 income tax return. The trial judge held that this deduction was allowable. The Government disagrees.
 
 
 15
 The Government maintains that agents' commissions are deductible solely as underwriting expenses under the statutory taxation scheme. Since investment expenses receive more favorable tax treatment than underwriting expenses, the Government argues that in order to effectuate the Congressional intent, investment expense treatment should be allowed only to those expenses which actually generate investment income. The Government points to the following facts in support of its contention that field representatives' commissions do not meet this standard: (1) The commissions are based solely on premium income, regardless of the loan services actually performed by each individual agent; (2) the policy loans made by Liberty Life are more in the nature of a service to its customers, since they are not particularly profitable to the company; (3) the calculations for the premiums to be paid take into account possible loan services to be rendered on the policy; (4) the primary function of the agent is the generation of underwriting income, and the servicing of policy loans as a convenience to the customer is merely another aspect of this primary function; and (5) the National Association of Insurance Commissioners (NAIC) specifically recommends that commissions of field representatives, including compensation for "collection or service fees," be treated as underwriting expenses, not as general expenses subject to allocation.
 
 
 16
 Keeping in mind the applicable standard,[5] we find that we do not need to dip deeply into the statutory history and the analysis of commentators to assess the significance of the facts enumerated above. The issue is simple and clearcut: Does the loan servicing work of the field representatives generate investment income? If so, an allocable portion of the commissions paid as compensation for those activities is a legitimate investment expense. The district court determined that the field representatives' duties in making and servicing the policy loans generated investment income and, finding the allocated compensation for those duties reasonable, allowed the deduction as an investment expense. We find ourselves in complete agreement with that conclusion.
 
 
 17
 There is no question that if these services had been performed by home office employees, the salaries of those employees would have been deductible as an investment expense. We fail to see any difference in effect when those duties are performed as Liberty Life has arranged by agents in the field. The Government's arguments enumerated above fail to persuade us otherwise: (1) the use of premiums alone for calculating the agents' commissions is not dispositive, since those commissions are intended as full compensation for all of the agents' duties, including the loan work. (2) The profitability of the policy loans as investments is also of little significance in this inquiry; profitable or not, the loans were legitimate interest-bearing investments with expenses connected to them. (3) The inclusion in the premium calculation of the costs of loan services actually supports the plaintiff's position, since the compensation for the field representatives' services is calculated directly from those premiums. (4) Plaintiff's motive in making the policy loans is irrelevant to the question of whether or not they were investments. Plaintiff no doubt offered these loans to make its underwriting business more attractive to prospective clients. Nevertheless, the loans generated investment income, and we find no requirement of "investment intent" in the statute, regulations, or legislative history. (5) The NAIC standards are applicable to "computations" made in determining the federal tax on life insurance companies. 26 U.S.C. § 818(a); See Commissioner v. Standard Life & Accident Ins. Co., 433 U.S. 148, 158-59, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977). They are not controlling on substantive questions of allocation. Jefferson Standard Life Ins. Co. v. United States, 408 F.2d 842, 849-50 (4th Cir. 1969), Cert. denied 396 U.S. 828, 90 S.Ct. 77, 24 L.Ed.2d 78 (1969). The deduction as an investment expense of that portion of the field representatives' compensation which was fairly allocable to loan services was permissible under the applicable statute and regulations.
 
 
 18
 III. The discounts "in the nature of interest"
 
 
 19
 As provided in 26 U.S.C. § 805(e)(3), the following sums will be excluded from the company's share of net investment yield for the purposes of determining the company's taxable investment income:
 
 
 20
 All amounts accrued for the taxable year for discounts in the nature of interest, whether or not guaranteed, on premiums or other considerations paid in advance on insurance or annuity contracts.
 
 
 21
 This section was added to the Code by the Life Insurance Company Income Tax Act of 1959, Pub.L. 86-69, 73 Stat. 112. The Senate Report which accompanied the 1959 Act noted that a deduction was allowed for "interest * * * on prepaid premiums to the extent of the accrual during the year" since such payments "are similar in nature to the deduction for interest paid or credited on deposits by a bank and therefore properly are not taken into account in determining the income of the life insurance company making the payment." S.Rep.No.291, 86th Cong., 1st Sess., pp. 16-17, 1959-2 Cum.Bull. p. 782; H.Rep.No.34, 1959-2 Cum.Bull. p. 742; U.S.Code Cong. & Admin.News 1959, pp. 1575, 1591.
 
 
 22
 Aside from the foregoing statement, we have found nothing in the scanty legislative history to disclose what Congress intended by the new provision. However, prior to the enactment of the 1959 Act, there were several cases which dealt with interest deductions claimed on account of discounts granted on advance payment of premiums. In Monarch Life Ins. Co. v. Commissioner, 38 B.T.A. 716 (1938), Aff'd 114 F.2d 314 (1st Cir. 1940), the insurance company permitted the policyholder to deposit funds with the company in advance of the due date; calculated the present value of the future premiums at a certain discount rate, and permitted the policyholder to deposit the reduced amount. As each premium became due, the policyholder's account was credited with the full amount of the premium. The First Circuit held that the discount was not interest paid, since it was not a payment for the use of borrowed money and was in no sense interest on indebtedness. A similar result was reached in Illinois Life Ins. Co. v. Commissioner, 30 B.T.A. 1160 (1934). However, in Equitable Life Assurance Soc. v. Commissioner, 44 B.T.A. 293 (1941), Modified and aff'd on other grounds in 137 F.2d 623 (2d Cir. 1943), Aff'd 321 U.S. 560, 64 S.Ct. 722, 88 L.Ed. 927 (1944), an insurance company accepted funds from certain accident and health policyholders with the agreement that the company would hold the fund on demand and supplement it with interest at a specified rate; in the event the policyholder did not demand repayment of the fund, the company would apply it, together with the interest supplement, in payment of premiums becoming due on the policy. At any time prior to the due date of the policy, the company would repay the fund to the policyholder on demand. The court allowed the interest deduction, saying that "credit for practical purposes is the equivalent of payment." Although we have found no mention of case law in the legislative history, the district court found that section 805(e)(3) was passed in response to the Monarch and Illinois Life Insurance decisions and both parties have accepted this view.
 
 
 23
 In the absence of more explicit legislative history, we may begin by ascribing the normally accepted meaning to a "deduction for interest paid or credited on deposits by a bank." Central to the idea of "interest" is compensation a payment or credit of interest to another for the privilege of holding and using his money. Thus, the discount arrangements made in Monarch Life and Equitable Life Assurance Society, supra, would qualify for the interest deductions as discounts "in the nature of interest." In each case, the policyholder was compensated by the insurance company for the early use and enjoyment of his money. With this background, it remains now to examine the facts surrounding the discounts granted by Liberty Life to determine whether they were truly "in the nature of interest."
 
 
 24
 In 1922 Liberty Life developed a system of mortgage cancellation life insurance. This system was designed to pay off a mortgagor's outstanding home mortgage balance in the event of his death prior to the mortgage termination. The insurance is marketed through mortgagee institutions, primarily savings and loan associations. Liberty Life bills these associations for the mortgage cancellation premiums; the associations in turn collect the premiums from the policyholders, who generally remit the premiums in monthly installments as part of their regular mortgage payments. The associations receive a commission for the sale and collection of the mortgage cancellation insurance.
 
 
 25
 Until 1946 the associations remitted the mortgage cancellation premiums monthly to Liberty Life, but in that year the company began offering the associations the option of remitting the 12 monthly premiums in advance for each year or paying a single annual lump sum at a 3 percent front-end discount. Since then, the company has expanded and diversified this option, so that for the taxable year 1965 the discounts granted ranged from 3.65 to 7.25 percent. It is these discounts which are at issue here.
 
 
 26
 In 1956, Liberty Life issued a new type of policy for its mortgage cancellation insurance business. The policy specifically provided for payment of premiums on a monthly, quarterly, semiannual, and annual basis. The contract read in part as follows:
 
 
 27
 CONSIDERATION: This policy is issued in consideration of the application herefor and of the payments in advance as hereinafter provided of the premium specified in the schedule. The first such premium shall be payable on delivery hereof and a like premium shall be due and payable annually, semi-annually, quarterly, or monthly, according to the Mode of Premium Payments, every twelve calendar months, six calendar months, three calendar months, or one calendar month, respectively, as the case may be, from the Date of Issue until premiums shall have been paid to the end of the Premium Paying Period or until the prior death of the Insured.
 
 
 28
 This was a level premium insurance policy, and such policies constituted in excess of 80 percent of the company's mortgage cancellation business in force in 1965.
 
 
 29
 We begin our inquiry into whether the annual premiums paid by the savings and loan associations were advance payments of 12 monthly premiums by reference to the district court's findings. The court found that the annual payment for the mortgage cancellation life insurance was a "mode" of payment. As previously stated, the taxpayer began in 1956 to issue a new type of mortgage cancellation insurance policy which provided for premium payments on an annual, semiannual, quarterly, or monthly basis. The policy specifically referred to the schedule of payments as a "mode of premium payments." As the district court found, plaintiff began calculating its monthly premiums in 1956 by taking a percentage of its annual rate, and the use of this formula resulted in total monthly payments greater than the annual rate. Significantly, the district court also found that the technique of taking the percentage of an annual rate to arrive at a monthly rate is typical of conversion of one "mode" of payment to another. On the basis of this and other evidence, the district court properly concluded that:
 
 
 30
 The system undertaken by Liberty Life in effect is annual coverage and not a prepayment of monthly premiums, regardless of the method used by the savings and loan association to collect their payments from the borrowers. The coverage effected by this plan was, in effect, annual. * * * (Liberty Life Insurance Co. v. United States, 40 AFTR 2d 77-5581.)
 
 
 31
 The district court's conclusion is supported by the contrast between plaintiff's treatment of its premium deposit agreements on other forms of insurance and its treatment of the premiums paid on its mortgage cancellation insurance. Liberty had premium deposit agreements with its policyholders similar to those involved in Equitable Life Assurance Co., supra. The agreements permitted the policyholder to pay future payments by paying their present value using a rate of interest which was usually 3.5 to 4 percent. The policyholder was then credited with the full payment each year when the premiums fell due. However, as the district court found, Liberty Life did not calculate its annual premium on the mortgage cancellation insurance by computing the present value of future payments. The real interest factor in the discounts at issue here was "substantially higher than that used to calculate its Advance Premium Deposit Agreements." We think that these facts demonstrate quite clearly that the discount claimed here bore little or no relation to the amount which Liberty expected to earn during the year 1965 on the annual premiums deposited by the associations, and therefore, the discount was not "a discount in the nature of interest."
 
 
 32
 There is no doubt that an element of interest was included in the discounts given to the associations, but that fact aids plaintiff's case very little. All insurance premiums are "paid in advance" in the sense that they are generally received by the company at the period of the beginning of the coverage. On ordinary life insurance policies, the policyholder may elect to make payments at more frequent intervals than once a year, but he is usually charged slightly more for the privilege of spreading out the payments. This surcharge does not convert the difference between the total of the frequent payments and the amount of the single annual payment into an interest discount. Surely, the Congress intended to require something more than this in order to permit the deduction authorized by section 805(e)(3). We think that this section of the Code deals with special situations and requires a showing that some further interest benefit is offered by the insurance company for genuine advance deposits.
 
 
 33
 The record reflects that there are several other substantial similarities between the payment scheme at issue here and that used in an ordinary, annual term, variable mode life insurance policy. The district court found that when a policyholder cancelled a mortgage insurance policy, the remaining amount of the payment beyond the end of the month of cancellation was refunded. However, the refund did not include interest. It was simply a pro rata portion of the amount actually paid by the associations. Refunds on ordinary, annual life insurance policies are computed on essentially the same basis.
 
 
 34
 In an effort to distinguish its refunds of the annual payment mortgage cancellation premiums from annual payment ordinary life refunds, Liberty argues that the unexpired term covered by the premiums on the mortgage cancellation business belongs to the associations until the monthly premiums become due, and therefore, that on cancellation, Liberty Life refunds a portion of the mortgage insurance annual premium which relates to the unexpired term covered thereby. However, the record shows that Liberty Life adopted the same practice with reference to the annual payment, ordinary life policies which were cancelled. As a company witness explained, the refund practices with respect to the two types of insurance had merged.
 
 
 35
 Also, there was no substantial difference in plaintiff's handling of death-time refunds. On its ordinary life policies, Liberty Life granted the policyholder the option of acquiring the right to refund of unearned portions of the premium on early cancellation by paying a small extra premium which went into a separate reserve. Liberty Life then paid a death benefit to the policyholder if the insured died before the full term had run. This arrangement is substantially identical to the refund of "unearned prepaid monthly premiums" which Liberty Life provided for mortgage cancellation insurance. Consequently, we do not agree that these formal differences, which are minimal, affect the result which we have reached.
 
 
 36
 Liberty Life also argues that the use of the midterminal reserve method of computing liability on its mortgage cancellation business is strong evidence of the fact that the annual premiums paid by the associations were advance payment of monthly premiums. However, the district court found that the plaintiff's reserves could have been as easily calculated by the mean reserve method, although changing methods would involve a great deal of expense. The court also found that annually paid premiums may also be calculated by the midterminal reserve method. Liberty Life has not shown that this finding is clearly erroneous and although the company's accounting procedure in this respect is entitled to some weight, we do not think it is sufficient to justify the special treatment afforded by section 805(e)(3).
 
 
 37
 In resolving an issue where the legislative history offers us so little assistance, we rely heavily, as the district court did, on the fact that the discount rates offered by Liberty Life were much higher than one would expect for an allowance of interest. As already stated, the front-end discount rates ranged from 3.65 to 7.25 percent, generating an effective rate of between 7 and 14 percent. These rates are even higher when the differences provided by the plaintiff's policy fees are taken into account. The evidence does not show that Liberty Life had any pressing need for the immediate use of the money or that such a need induced it to grant an especially high interest rate. Consequently, the high rate suggests that more was at work than a discount "similar in nature to the deduction for interest paid or credited on discounts by a bank." The figure is high enough to raise a reasonable suspicion that the discount must be something else than a credit for interest. The district court found from conflicting evidence that the "something else" consisted in large part of savings on expenses associated with the less frequent payments. The plaintiff saved on commissions payable to the savings and loan associations, because the commissions were calculated from the discounted premium. The necessity of 12 separate billing cycles was eliminated. The court also found that competitive advantages accrued to Liberty Life by the offering of the lower discounted rate. Although plaintiff challenges these findings, it has not shown that they were clearly erroneous, and we adopt them for the purpose of this decision.
 
 
 38
 The Government relies on the district court's finding that Liberty Life did not report on Internal Revenue Service form 1099 the deductions here claimed as interest. There is no evidence that any of the associations reported the discounts granted by plaintiff as interest income. However, we do not rely on this finding as a controlling factor in our decision, because of the confusion that may well have been generated by a change in the rulings which the Internal Revenue Service issued on the subject. Rev.Rul. 65-199, 1965-2 Cum.Bull. 20, held that any increment in the value of advance, or prepaid premiums, or of premium deposit funds applied to the payment of premiums on life insurance policies would result in taxable income to the policyholder and should be reported on form 1099. However, this was a reversal of a prior ruling, Rev.Rul. 65-24, 1965-1 Cum.Bull. 31, which held that the discounts should not be included in the income of the premium payer or reported by the insurance company. Moreover, the 1965 ruling stated that where advance premiums had been deposited on or before July 8, 1965, the new position would be applied only to increments credited or made available for withdrawal subsequent to the first premium due date falling after July 31, 1965.[6]
 
 
 39
 Our attention has been called to Liberty National Life Ins. Co. v. United States, 39 AFTR 2d 77-540 (N.D.Ala.1976), on appeal to the Fifth Circuit. This is a case in which interest treatment was allowed. Although we do not agree entirely with the rationale of that decision, we think the case is distinguishable on its facts. There, a small company, the predecessor to Liberty National Insurance, issued small burial policies with weekly premiums of less than one dollar. An acute shortage of funds caused it to offer a discount on advance premiums paid 52 weeks in advance, and also a smaller discount on advance premiums paid 26 weeks in advance. After the company was merged with Liberty Life in 1944, the discount practice was continued. The court found that the expense factor was unaffected by the discount; that there were no expense savings, and that there was an increase in costs incurred in handling the additional accounting. Also, the court explicitly found that the discount constituted interest income to the premium payers.
 
 
 40
 By contrast, the discounts claimed in this case consisted largely of savings on expenses and were granted by a financially sound insurance company because of the resulting competitive advantages. The district court found that Liberty Life's discounts were given for reasons unrelated to a desire for immediate possession and use of the premium money. The court below correctly concluded that the reductions in the annual premiums paid by the associations were not prepaid premiums nor discounts "in the nature of interest" as contemplated by Congress.
 
 The judgment of the district court is
 
 41
 AFFIRMED.
 
 
 
 *
 Wilson Cowen, Senior Judge of the Court of Claims, sitting by designation
 
 
 [1]
 Under the complicated federal scheme for taxing life insurance companies, investment expenses receive a tax treatment more favorable to the taxpayer than that accorded to other kinds of expenses
 
 
 [2]
 This last issue arises under a Government counterclaim by way of offset, since the 3-year statute of limitations would bar the Government from raising the issue directly. Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932)
 
 
 [3]
 Liberty Life Ins. Co. v. United States, 40 AFTR 2d 77-5575 (D.S.C.1977)
 
 
 [4]
 The foreign companies do receive a reduction in fee for reinvesting their South Carolina policy reserves within the state
 
 
 [5]
 Investment expenses are "those expenses of the taxable year which are fairly chargeable against gross investment income." Treas.Reg. § 1.804-4(b) (1)(i)
 
 
 [6]
 See also Rev.Rul. 66-120, 1966-1 Cum.Bull. 14, which adopted a transitional rule to protect taxpayers who might have relied on previous rulings