FARMERS LIFE INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 43317.   Promulgated December 22, 1932.

*R. W. Colflesh, Esq.,* and *Thomas Watters, Jr., Esq.,* for the petitioner.

*John D. Foley, Esq.,* and *James C. Maddox; Esq.,* for the respondent.

OPINION.

MARQUETTE: Five main questions are presented for decision by this proceeding. The first is whether petitioner's guaranteed dividend fund, its survivorship fund, and its coupon fund constitute "reserve funds required by law" within the meaning of the Revenue Acts of 1924 and 1926. The provisions of those acts which are here pertinent are identical in wording and read as follows:

SEC. 245. (a) In the case of a life insurance company the term "net income" means the gross income less—

\*      \*      *      *      *      *      *

(2) An amount equal to the excess, if any, over the deduction specified in paragraph (1) of this subdivision, of 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year.

Petitioner concedes in argument that the term "reserve funds required by law" means a true insurance reserve based upon a life contingency and not assets held for the ordinary running expenses of the business. It is contended, however, that the guaranteed dividend fund meets the requirement of a true insurance reserve because the excess premium charged enabled the policyholder to participate in the fund if he survived for twenty years. Hence, petitioner says, there is a mortality element in the fund which distinguishes it from funds set aside for ordinary running expenses.

We can not agree with that contention. In *Massachusetts Mutual Life Ins. Co.* v. *United States*, 56 Fed. (2d) 897, the true insurance reserve is described thus:

* * * Under the level-premium plan the insured pays during his early years a sum in excess of the cost of his insurance. The excess is devoted to the creation of a reserve fund which enables the insurance to be maintained in later years when the stipulated level premium would be insufficient to meet the current costs of insurance on the mutual-premium plan.

The table rate of premiums provided for in life insurance on the mutual level-premium plan is calculated, first, by adopting an accepted table of mortality showing the death rate for every age of life, and second, by adopting an assumed rate of interest, such as the company may safely expect to realize upon the investment of the amounts of such premiums for the duration of all of its policies. With these two factors, a calculation is made of the sum each insured must pay in advance so as to put the company in funds with which to pay all outstanding policies as they become claims, providing deaths occur exactly in accordance with the table of mortality, and also providing the rate of interest earned on the company's invested funds is exactly the same as the rate assumed in calculating its premiums. The sum ascertained in this way is called the net or mathematical premium.

The calculation of the reserve is thus an actuarial function, and, being the amount theoretically necessary for reinsuring the risks, is sometimes called the reinsurance fund or reinsurance reserve. As applied to a policy, the term means value or valuation, but that part of the assets of the company, which,

according to a specified table of mortality, with interest at the assumed rate, must be set apart to meet or mature the company's obligation to the insured on his death or upon the surrender or cancellation of his policy.

\*        \*        \*        \*        \*        \*        \*

As thus calculated, this reinsurance reserve is, we think, the reserve which has a technical and special meaning in the law of insurance and is the reserve required by law within the meaning of the Federal statutes in so far as the question here involved is concerned. None of the reserves here claimed is calculated upon the basis above set forth, and possess none of the characteristics of the legal reserve required by law, as above described. *McCoach* v. *Insurance Co. of North America*, 244 U. S. 585; *Maryland Casualty Co.* v. *United States*, 251 U. S. 342; *United States* v. *Boston Insurance Co.* 269 U. S. 197; *New York Life Insurance Co.* v. *Edwards*, 271 U. S. 109; and *Minnesota Mutual Life Insurance Co.* v. *United States*, 66 C. Cls. 481, certiorari denied 279 U. S. 856.

In *Midland Mutual Life Ins. Co.*, 19 B. T. A. 765, we held that reserves for dividends left to accumulate at interest, and for premiums paid in advance, are not " reserve funds required by law " within the meaning of the revenue acts. See also *Old Line Ins. Co.*, 13 B. T. A. 758.

Petitioner's guaranteed dividend fund requires no actuarial computation to determine any liability of the company. Such liability is not affected by the probable mortality rates of the policyholders. Indeed, it is quite possible that all the policyholders of a class may die before the end of the twenty-year period necessary for participation in the fund, or all might allow their policies to lapse. In either event, under the terms of the contract, no liability would attach to the petitioner with respect to that class. The fund, to that extent, would become the property of the petitioner, apparently, for there is no provision for distributing it other than to surviving, persistent policyholders of the class. No liability attaches to petitioner with respect to the fund unless and until it is found that at the end of twenty years there are living policyholders who have kept their insurance policies in force. Otherwise, no enforceable interest in the fund can be acquired. Such a condition is very different from the petitioner's liability upon an insurance policy, for the holder thereof acquires an enforceable interest upon the payment of the premiums and the only uncertainty is the exact time when the company will be called upon to make good its liability. We see no essential difference between the petitioner's guaranteed dividend fund and the funds dealt with in the cases above cited.

The same reasoning applies with respect to petitioner's survivorship fund, which was identical in plan of structure and conditions of distribution with the dividend fund. In our opinion, therefore, no deduction is allowable with respect to either fund for the years here in question.

With respect to petitioner's coupon fund, we find that guaranteed premium reduction coupons which entitle the policyholder to a credit of a definite amount on a fixed future date are attached to policies of a certain kind. We have held that such coupons constitute an insurance obligation and that the reserves maintained on account thereof are "reserves required by law" within the meaning of the revenue statutes. Cf. *Standard Life Ins. Co. of America*, 13 B. T. A. 13; affd., 47 Fed. (2d) 218; *Reserve Loan Life Ins. Co.*, 18 B. T. A. 359; *Commissioner* v. *Western Union Life Ins. Co.*, 61 Fed. (2d) 207. Following those decisions, we hold that the amount of reserve petitioner is required to hold for payment of such coupons and interest is a reserve fund required by law for which deduction should be allowed under section 245 (a) (2) of the Revenue Acts of 1924 and 1926.

The next question is whether $1,000 received by petitioner as a forfeit constitutes taxable income. The Revenue Act of 1926, in section 244 (a), provides that the gross income of a life insurance company means the gross amount received in any taxable year from interest, dividends and rents. No other source of income is mentioned, and, therefore, all income from other sources is to be excluded in computing income tax of petitioner. The sum in question was paid to petitioner as consideration for an option to purchase a ranch. The option was not exercised and the amount of $1,000 paid was forfeited to petitioner. We think it is obvious that money so received is not to be classed either as dividends, interest, or rents. The amount is not taxable income, therefore, under the statute, and should be excluded from petitioner's return of gross income.

The third question relates to the proper amount of deduction from petitioner's gross income on account of investment expenses during the year 1925. The Revenue Act of 1924, in section 245 (a) (5), provides that in the case of a life insurance company the term "net income" means the gross income less: "Investment expenses paid during the taxable year: *Provided*, That if any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed one-fourth of 1 per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year."

Petitioner deducted $7,554.24 as investment expense and that was allowed by the respondent. It is now claimed that petitioner's expenses amounted to several thousand dollars more than the amount deducted and that, therefore, such additional deduction should be allowed as will bring the total up to $8,811.88, which is one-fourth of 1 per cent of the mean of invested assets. The items making up the additional expenses include postage, printing and stationery, telegraph and telephone charges, discounts on collections and home

office traveling expenses. While the record does not clearly set forth the proportions of these expenses between petitioner's investments and its underwriting, we are satisfied that they are attributable in part to each line of business activity. The statute does not require that any definite proportion of general expenses be assigned to investment expenses and we think the petitioner is fairly entitled to the additional deduction which is now sought. The additional expenses, as well as those for which deduction was taken in the first instance, were all actual expenses of the petitioner for the year 1925. We must now consider them as an entirety, not as separate groups. Some part of the general expenses were assigned to investment expense, which brings into operation the statute above cited. We are of opinion that in recomputing petitioner's income tax the full deduction of $8,811.88 should be allowed for investment expense.

The next question concerns deductions for depreciation on office furniture and fixtures and on an automobile. The Revenue Acts of 1924 and 1926, in section 245 (a) (7), state that net income of a life insurance company means gross income less " a reasonable allowance for the exhaustion, wear and tear of property, including a reasonable amount for obsolescence." Petitioner contends that a reasonable rate of depreciation is 10 per cent for its furniture and fixtures and 33⅓ per cent for its automobile, which was secondhand when purchased.

The record discloses that petitioner purchased office furniture and · fixtures during each of the years 1921 to 1926, inclusive. The amount of $1,290.60 was so expended in 1921 and a total of $1,692.29 during the succeeding five years. Whether the subsequent purchases were for additional equipment needed because of expanding business, or were to replace obsolete or worn out furniture, is not disclosed. The record does not indicate the amount of depreciation allowed by the respondent or the basis upon which it was computed. Petitioner's assistant secretary was asked to state, from his experience in a life insurance office, the average life of the furniture and fixtures used about petitioner's office. His answer was: " Well, that of course is difficult to state, but I should say probably, as a general rule, ten years would be a maximum life." Nothing further is offered by the record to aid us in determining what is a reasonable allowance for depreciation of the petitioner's office equipment. The petitioner had the burden of showing what would be a reasonable rate for depreciation upon the office furniture. We think it has failed to sustain that burden and its claim for a 10 per cent deduction for depreciation should be denied.

Respecting the secondhand automobile purchased in 1926, we have something more concrete to work upon. The car was used in peti-

tioner's business. The witness, himself the owner of a car, knew how petitioner's automobile was used and placed its useful life at three years. That period, we think, is not unreasonable for a second-hand automobile and, therefore, a depreciation of 33⅓ per cent of the price of the car should be allowed for the year 1923.

The last question here presented is whether cash received as consideration for executing leases of oil bearing lands in Texas constitutes taxable income.

While it is a rule of property in Texas that an oil and gas lease such as we have now before us vests in the grantee a fee title in the minerals themselves, the Supreme Court has held that that rule can not vary the operation and intendment of section 208 of the Revenue Act of 1924. *Burnet* v. *Harmel*, 287 U. S. 103. That case involved oil and gas leases of land in Texas, and the court held that the Revenue Act neither says nor implies that the determination of gain from the sale or exchange of capital assets is to be controlled by state law. It was accordingly held that the capital gain rate might not be applied to either the bonus received upon execution of the leases or the usual royalties later received. That decision is controlling in the present case and applies to both taxable years, for section 208 of the Revenue Act of 1924 is reenacted without change in the Revenue Act of 1926. We hold, therefore, that the cash consideration of $3,000 and $30,000 received by petitioner for oil and gas leases in 1925 and 1926, respectively, constituted taxable income to it.

Reviewed by the Board.

*Decision will be entered under Rule 50.*