THE UNION CENTRAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2094–78.     Filed October 13, 1981.

*William R. Seaman, Jerry L. Cowan,* and *Thomas C. Rink,* for the petitioner.

*Conley G. Wilkerson,* for the respondent.

WILES, *Judge*: Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1972 | $36,866.80 |
| 1973 | 65,075.56 |
| 1974 | 90,410.52 |

Several issues having been resolved by concessions[1] prior to trial, the only issues remaining for decision are:

(1) Whether any portion of the Ohio franchise tax paid by petitioner is deductible as an investment expense under section 804(c).[2]

(2) Whether a portion of the unimproved land surrounding

---

[1] The settlements reached by the parties on those issues are set forth in the stipulation of facts filed herein.

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years at issue unless otherwise stated.

petitioner's home office building must be included in its "assets" under section 805(b)(4).

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The Union Central Life Insurance Co. (hereinafter petitioner), a mutual life insurance company organized under the laws of the State of Ohio, maintained its principal place of business at Waycross and Mill Roads, Cincinnati, Ohio, when it filed its petition in this case. It timely filed its Federal income tax returns (Forms 1120L) for the taxable years 1972, 1973, and 1974 with the District Director of Internal Revenue, Cincinnati, Ohio. At all material times, petitioner was a life insurance company as defined in section 801.

During the years 1972, 1973, and 1974, petitioner kept its books and prepared its Federal income tax returns on a calendar year basis and used the accrual method of accounting as required for its annual statement[3] by the National Association of Insurance Commissioners (NAIC) and as provided in section 818.

In each of the taxable years at issue, petitioner paid an Ohio franchise tax in accordance with the provisions of Ohio Revised Code Annotated sections 5725.18 and 5725.19 (Page). This tax was computed at 0.3 percent of petitioner's surplus as provided by the statute and was the only tax petitioner paid to Ohio for the privilege of doing business in the State. For each of those years, petitioner allocated a portion of the franchise tax paid to its investment department and deducted such amount on its Federal income tax returns as an investment expense in computing investment yield and taxable investment income under section 804. The allocation of the franchise tax to the investment department was based on the ratio of petitioner's gross investment income to total gross income. For the years 1972, 1973, and 1974, the total Ohio franchise tax paid by petitioner, the amounts deducted as an investment

---

[3]Petitioner was required to, and did, file annual financial statements with the insurance departments of the various States in which it operated.

expense, and the percentage relationship between them were as follows:

|  | 1972 | 1973 | 1974 |
|---|---|---|---|
| Ohio franchise tax | $196,672 | $297,550 | $192,896 |
| Investment expense | 58,440 | 61,284 | 56,962 |
| Investment expense as a percentage of franchise tax | 29.71% | 29.53% | 29.53% |

In his notice of deficiency, respondent determined that no part of the Ohio franchise tax paid by petitioner in 1972, 1973, and 1974 was deductible as an investment expense under section 804(c). Instead, respondent determined that such franchise taxes were only deductible under section 809(d)(12) in determining petitioner's gain or loss from operations.

In 1958, petitioner acquired a tract of 189.2 acres of land located at the northwest corner of Mill and Waycross Roads in Hamilton County, Ohio, at a cost of $451,591. Petitioner purchased the land in order to relocate its entire home office personnel, equipment, and activities from a multistory office building in downtown Cincinnati to the suburbs. Prior to completing the acquisition, petitioner petitioned the Hamilton County Regional Planning Commission to rezone the land from "residential" to "retail business." In a letter to the full planning commission dated November 26, 1958, George Harnish, executive director of the commission, recommended approval of the requested zoning change stating as follows:

In reporting upon the petitioner's request, your staff would like to remark first that it is not an ordinary one. The very magnitude of the proposal gives rise to two questions that have considerable planning implication: (1) why should almost 200 acres be rezoned to accommodate one office building, and (2) to what extent will the Commission receive similar requests for rezoning other large areas in the outlying sections of the county, particularly along the circumferential route of the Circle Freeway?

To throw some light on the first question, the petitioner has submitted a small-scale plot plan showing the schematic disposition of various areas within the boundaries of the tract. This is by no means a final or exact determination of the overall layout, but is offered simply as a sketch illustrating the variety of uses of the property which are considered accessory to the office building itself. These include off-street parking areas, driveways, an athletic field and other recreational areas for the employees and a general landscape treatment that would, in a sense, create the project's own environment.

The zoning change was granted and petitioner erected its

present home office building and improvements on a portion of the tract. Petitioner moved its business operations to the Hamilton County site in 1964.

At all times material hereto, petitioner has maintained exclusive possession of the entire 189.2-acre tract of land. Of this total acreage, petitioner's office building, parking lots, access roads, and a portion of the property that is physically developed and landscaped with plantings occupy approximately 60 acres in the extreme corner of the tract where Mill and Waycross Roads intersect. Respondent has stipulated that these 60 acres constitute "home office property" used by petitioner in carrying on its insurance business and, therefore, are not an asset under section 805(b)(4). The remaining 130 acres consist of undeveloped land in a state of rough natural growth. The value of the 130 acres of land in 1972, 1973, and 1974 was $1,900,000 or $14,615.38 per acre.

No part of the 130 acres of undeveloped land has ever been sold, leased, offered for sale or lease, or utilized by petitioner in any direct way for the production of income. This acreage is available to petitioner's employees for informal recreational purposes (although it does not contain any formal or developed recreational facilities) and is held for future development and as a buffer against unwarranted and undesirable encroachment.

On its Federal income tax returns for 1972, 1973, and 1974, petitioner did not include the 130 acres of land as an asset under section 805(b)(4). In his notice of deficiency, respondent determined that this land constituted investment property and, therefore, was includable in petitioner's assets at a value of $1,900,000.

## OPINION

We must decide the following issues:

(1) Whether any portion of the Ohio franchise tax paid by petitioner in 1972, 1973, and 1974 is deductible as an investment expense under section 804(c). If we conclude, as petitioner argues, that some portion of the franchise tax is so deductible, we must then decide whether petitioner properly allocated such tax between its investment and underwriting activities.

(2) Whether the 130 acres of unimproved land surrounding

petitioner's home office building are includable in petitioner's "assets" under section 805(b)(4).

Since the resolution of these issues turns on the interpretation of several provisions of the Life Insurance Company Income Tax Act of 1959,[4] a highly complex statute, we feel compelled to briefly discuss both the history and present scheme of life insurance company taxation under this act in order to set the context for our decision.

Prior to 1921, life insurance companies were taxed under the same provisions of the taxing statutes as ordinary corporations.[5] All of their income, including premium receipts, was included in gross income and they were entitled to the deductions normally allowed other corporations. In addition, special deductions were allowed for the net annual increase to reserves required by law and for amounts paid to meet other obligations under its insurance policies. This method of taxation, however, generated constant litigation concerning the allowable deduction for additions to reserves and was sharply criticized by the insurance industry, particularly with respect to the inclusion of premiums in gross income.[6] In an attempt to resolve the problems and correct the perceived inequities, Congress, in the Revenue Act of 1921, established a new system of taxation applicable to insurance companies alone. Under this act, life insurance companies were taxed on their investment income from interest, rents, and dividends with allowable deductions for amounts set aside to maintain 'policy reserves and for investment expenses and other similar expenses related to the production of investment income.[7] Premiums paid by policyholders were regarded as similar to bank deposits and excluded from income. The effect of the 1921 Act was to tax life insurance companies only on that portion of their net investment income which was not needed as reserves to pay present and future claims of policyholders.

---

[4]Pub. L. 86–69, 73 Stat. 112, effective for the taxable years beginning after Dec. 31, 1957.

[5]See sec. 38, Corporation Excise Tax of 1909, ch. 6, 36 Stat. 11; sec. II G, Revenue Act of 1913, ch. 16, 38 Stat. 114; secs. 10, 12, Revenue Act of 1916, ch. 463, 39 Stat. 756; secs. 233, 234, Revenue Act of 1918, ch. 18, 40 Stat. 1057.

[6]See Hearings on H.R. 12863, Before the House Comm. on Ways and Means, 65th Cong., 2d Sess. 811 (1918); Proceedings of the Fourteenth Annual Meeting of Life Insurance Presidents 141, 143–145 (December 1920).

[7]See secs. 244 and 245, Revenue Act of 1921, ch. 136, 42 Stat. 261.

This so-called free-investment income approach to the taxation of life insurance companies remained in effect until 1958.[8]

The Life Insurance Company Income Tax Act of 1959 significantly revised the scheme of imposing income taxes on life insurance companies. As implemented by the provisions of subchapter L, part I, sections 801–820, I.R.C. 1954, the 1959 Act restored a total income approach to the taxation of such companies which was abandoned in 1921. Pursuant to section 802, a life insurance company is subject to tax at ordinary corporate rates on its "life insurance company taxable income" as determined under a three-phase procedure. These phases consist of (1) taxable investment income; (2) one-half of the excess of gains from operations over taxable investment income; and (3) the remaining gains from operations when distributed to shareholders. In this case, we are concerned with only phases I and II.[9]

The phase I portion of taxable income, corresponding to the free-investment income base used prior to 1958, involves the ascertainment of the life insurance company's share of each and every item of investment yield. Investment yield is defined in section 804(c) as gross investment income less investment expenses, real estate expenses, depreciation, depletion, and certain trade or business deductions not attributable to the insurance business. This determination is made through an intricate series of computations under sections 804 and 805 designed to allocate such items of investment yield between the company's share and the policyholder's share. Section 804(a)(1) provides that the policyholder's share of each of these items is excluded from taxable investment income. This exclusion serves the same function as the reserve deduction under prior insurance laws and reflects the fact that a significant portion of the income generated by the company's

---

[8]Before 1921 and 1958, various formulas were employed to determine the portion of a life insurance company's net investment income which was allocable to policyholders and thus not subject to tax. These formulas, which often varied from year to year, created considerable uncertainty as to the tax treatment of life insurance companies and also enabled such companies to escape taxation on a substantial part of their total revenues. Responding to these problems, Congress enacted the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112. S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 772.

[9]The phase III tax applies only to stock life insurance companies and not mutual companies, such as petitioner. S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 779.

investment assets is normally set aside to meet policyholder reserve requirements. See *United States v. Atlas Life Insurance Co.*, 381 U.S. 233, 235–236 (1965). The nontaxable policyholder's share is a function of the "policy and other contract liability requirements" and is determined in large part by applying to each item of investment yield a fraction, the numerator of which represents life insurance reserves, as defined in section 801(b), and the denominator of which consists of the insurer's "assets" as defined in section 805(b)(4).[10] The remaining portion of the investment yield belongs to the company and constitutes the phase I tax base.

The second phase of the taxing scheme, contained in sections 809 through 812, represents "gains from operations" and is designed to determine the total income of a life insurance company less certain specified deductions. Thus, in calculating the phase II tax base, the company's gross receipts from all sources are taken into account, including its share of investment yield[11] as well as the income derived from the operation of its insurance business. Pursuant to section 809(d), deductions for the following items are allowed against these gross receipts to arrive at gains from operations: (1) All claims,

---

[10]Stated in more detail, the policyholder's share is the percentage obtained by dividing the "policy and other contract liability requirements" in sec. 805 by the investment yield. Sec. 804(a)(1). To determine the "policy and other contract liability requirements," the company's investment yield is first divided by its assets to produce a rate of return on investments, referred to as an earnings rate. This rate, which is subject to a downward adjustment if the average of the earnings rate for the current and preceding 4 years is lower, is then multiplied by the company's adjusted life insurance reserves, and the product is the excluded portion of investment yield attributable to policyholder reserves. To this amount are added exclusions similarly computed for investment earnings attributable to pension plan reserves and for interest paid on indebtedness, supplementary insurance contracts, and discounts on prepaid premiums. The ratio of the amount so calculated to the total investment yield constitutes the percentage of each item of investment yield that is deemed added to policy reserves and thus excluded from the life insurance company's income. See *Jefferson Standard Life Insurance Co. v. United States*, 408 F.2d 842, 844–845 (4th Cir. 1969); *Union Bankers Insurance Co. v. Commissioner*, 64 T.C. 807, 820–821 (1975).

[11]The taxable portion of investment yield in phase II is calculated somewhat differently, however, than in phase I. The fundamental difference is that under phase II, the exclusion for the policyholder's share, referred to as the "required interest," is determined on the basis of the interest rates assumed by the company in setting up its reserves, rather than the actual earnings rate as used in phase I. (See note 10 *supra*.) Secs. 809(a) and 810(c); *Jefferson Standard Life Insurance Co. v. United States*, 408 F.2d 842, 845 (4th Cir. 1969). This difference generally produces an increase in the company's share of investment yield under phase II relative to what it is in phase I. S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 785; Clark, "The Federal Income Taxation of Financial Intermediaries," 84 Yale L. J. 1603 (1975).

benefits, and losses incurred on insurance and annuity contracts; (2) increases in reserves; (3) dividends to policyholders; (4) operations loss carryovers and carrybacks; (5) certain nonparticipating contracts; (6) certain group life, accident, and health insurance premiums; (7) assumption reinsurance payments; (8) tax-exempt interest and dividends received; (9) investment expenses not allowable in phase I; (10) the small business deduction; (11) certain mutualization distributions;[12] and (12) subject to various restrictions, all other deductions allowable in computing taxable income to the extent not allowable as deductions in determining investment yield. With respect to items (3), (5), and (6), however, a special limitation or ceiling is placed on the total amount deductible thereunder. Specifically, section 809(f) provides that the sum of these three deductions cannot exceed $250,000 plus the amount by which gains from operations computed without regard to such deductions exceed taxable investment income.[13] When the various deductions allowed under section 809(d) are subtracted from gross receipts, the result is the life insurance company's gain (or loss) from operations. Sec. 809(b).

If the section 809 calculation produces a gain from operations, two additional steps are required to arrive at the final tax base—life insurance company taxable income. First, if the gain from operations exceeds taxable investment income, one-half of the excess, referred to as underwriting gain,[14] consti-

---

[12]This provision was stricken by sec. 1901(a)(98)(B)(i), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1781, and, accordingly, item (12) was redesignated as sec. 809(d)(11).

[13]The purpose of this provision is to establish a minimum tax base for insurance companies that receive a large part of their income from investments. See S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 785–786. Absent such a limitation, mutual life insurance companies, for example, could simply declare policyholder dividends, deduct the full amount thereof, and thereby eliminate entirely their gains from operations. Under the unique tax formula utilized in sec. 802(b), this would result in such companies paying far less tax under the total income approach of the 1959 Act than they had been paying previously under the free investment income method. Therefore, to assure that mutual companies are at least subject to tax on approximately the same base as under prior law, sec. 809(f) provides that the three "special deductions" listed therein cannot reduce gains from operations more than $250,000 below the phase I tax base.

[14]Underwriting gain consists principally of mortality and loading savings. Mortality savings are realized if policyholders outlive their assumed life expectancies used in establishing premium charges. Loading savings accrue when an insurance company's actual expenses of providing coverage are below estimates made in setting such premiums. S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 779.

tutes the phase II tax base, and the company is taxed currently on the combined phase I and phase II amounts.[15] Second, if the gain from operations is less than or equal to taxable investment income, a current tax is imposed on the gain from operations only.

With this intricate pattern of life insurance company taxation in mind, we now proceed to address the two issues presented in this case.

During each of the years 1972, 1973, and 1974, petitioner paid an Ohio franchise tax pursuant to Ohio Revised Code Annotated sections 5725.18 and 5725.19 (Page).[16] Petitioner charged to its investment department a portion of the franchise tax paid in each of those years and deducted such amounts as investment expenses under section 804(c)(1) in arriving at its phase I tax base. Respondent disallowed the claimed deductions on the ground that the tax in question did not constitute an "investment expense" within the meaning of

---

[15]In this situation, the company obtains a tax deferral on 50 percent of its underwriting income. The asserted rationale for this special tax advantage is that it is exceedingly difficult to determine the true underwriting income of a life insurance company on an annual basis because of the long-term and contingent nature of its contracts. S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 784.

[16]Sec. 5725.18 provides as follows:

"An annual franchise tax on the privilege of being an insurance company is hereby levied, measured by the smaller of the following bases as applied to a domestic insurance company:

"(A) The capital and surplus of a domestic insurance company having capital divided into shares, or the surplus of a domestic insurance company not having capital divided into shares, at the value thereof reported by the company in its annual statement for the preceding year filed with and approved by the superintendent of insurance setting forth the admitted and nonadmitted assets and the liabilities of the company, including in such liabilities:

"(1) The reserve and unearned premium liabilities computed as provided by law, the same being the amount of debts of an insurance company because of its outstanding policies in gross;

"(2) Amounts set apart for the payment of dividends to policyholders, and all actual liabilities set forth in the annual statement;

"(B) Eight and one-third times the gross amount of premiums received by any such domestic insurance company from policies covering risks within this state during the preceding calendar year, after making the deductions prescribed by section 5729.03 of the Revised Code for foreign insurance companies. The objects of such tax are those declared in section 5725.24 of the Revised Code, to which only the same shall be applied."

Sec. 5725.19 provides the following rate of franchise tax:

"In the month of June, annually, the auditor of state shall charge for collection from each domestic insurance company a franchise tax of three-tenths of one percent of the amount determined by the superintendent pursuant to section 5725.18 of the Revised Code and certified to the auditor of state. In no case shall such tax be less than twenty-five dollars."

section 804(c)(1), but allowed petitioner to deduct such payments pursuant to section 809(d)(12) in computing its gain from operations. Although the dollar amount of the deduction is the same under either section, the tax benefits to petitioner are significantly increased if the franchise tax qualifies as an investment expense.[17]

Section 804(c)(1) provides that, in determining investment yield, a life insurance company is permitted to deduct from gross investment income the following:

(1) INVESTMENT EXPENSES.—Investment expenses for the taxable year. If any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed the sum of—
(A) one-fourth of one percent of the mean of the assets (as defined in section 805(b)(4)) held at the beginning and end of the taxable year,
(B) the amount of the mortgage service fees for the taxable year, plus
(C) whichever of the following is the greater:
(i) one-fourth of the amount by which the investment yield (computed without any deduction for investment expenses allowed by this paragraph) exceeds 3¾ percent of the mean of the assets (as defined in section 805(b)(4) held at the beginning and end of the taxable year reduced by the amount described in subparagraph (B), or
(ii) one-fourth of one percent of the mean of the value of mortgages held at the beginning and end of the taxable year for which there are no mortgage service fees for the taxable year.

Respondent maintains that only expenses directly related to investment income are deductible under this section, relying on *Great Southern Life Insurance Co. v. Commissioner*, 89 F.2d 54, 57 (5th Cir. 1937), affg. 33 B.T.A. 512 (1935), cert. denied 302 U.S. 698 (1937). He argues that while the Ohio franchise tax may relate directly to premiums, it is never directly related to investment income because it is neither imposed on petitioner's investment assets nor directly on the income produced by such assets. Respondent asserts that since the

---

[17]The tax consequences to a mutual life company of treating an expense as a phase I rather than a phase II deduction turn largely on the special deductions contained in sec. 809(f); in particular, the policyholder dividend deduction. As noted previously, such deductions are limited to $250,000 plus the difference between the gain from operations (before these deductions are taken into account) and the taxable investment income. Thus, to the extent that a company can deduct an expense item in phase I, its taxable investment income base will be lowered, thereby increasing by a like amount the policyholder dividend deduction allowable under sec. 809(d)(3). The result is a larger reduction in the company's phase II tax base. See Harman, "The Pattern of Life Insurance Company Taxation Under the 1959 Act," 15th Ann. Tul. Tax Inst. 686 (1965).

franchise tax, as applied in the years at issue, was computed on the basis of petitioner's surplus, which includes both investment and underwriting income, there was only a remote connection between such tax and petitioner's investment income. In respondent's view, this relationship precludes any deduction under section 804(c)(1).

On the other hand, petitioner argues that the Ohio franchise tax constitutes a general expense of its entire business and, therefore, the portion of such tax which is properly allocable to the investment department is deductible under section 804(c)(1). Petitioner contends that respondent has completely ignored the distinction drawn in the statute between investment expenses and general expenses assigned thereto and emphasizes that the direct relationship required for the former is not the criterion for determining whether the latter are deductible. For the reasons stated below, we agree with and hold for petitioner.

At the outset, we must note that the proper tax treatment of the franchise tax in question cannot be discerned from the face of the statute. Thus, the first part of section 804(c)(1) merely provides that investment expenses are deductible from gross investment income. The second clause then adds a limitation on the total investment expense deduction if any general expenses are partly assigned to or included in investment expenses.[18] Furthermore, the statute does not even define either of the operative terms "investment expenses" or "general expenses" and is similarly silent with respect to the requisite nexus that must be established between such expenses and investment income before a deduction will be allowed.

The regulations under section 804(c), however, shed some light on both the interpretation and application of the statute. Section 1.804–4(b)(1)(i), Income Tax Regs., provides that "investment expenses" are those expenses of the taxable year that are "fairly chargeable against gross investment income" such as salaries and expenses paid exclusively for work in looking after investments and costs of printing, stationery,

---

[18]Examination of petitioner's tax returns for 1972, 1973, and 1974 reveals that the total amount of investment expenses claimed in those years did not exceed the statutory limitation.

postage, and stenographic work incident to the collection of interest. The term "general expenses" is defined in section 1.804–4(b)(1)(ii), Income Tax Regs., as "any expense paid or incurred for the benefit of more than one department of the company rather than for the benefit of a particular department thereof." Included as examples of general expenses that may properly be allocated to investment expenses are real estate taxes, depreciation, and other expenses attributable to office space owned by the life insurance company and used in the operation of its investment department, and salaries attributable to more than one department of the company, including the investment department. In addition, section 1.804–4(a), Income Tax Regs., states that investment expenses are deductible under section 804(c) only to the extent that they relate to investment income, they are ordinary and necessary expenses within the meaning of section 162,[19] and the deduction of such expenses is not disallowed by any provision of the Internal Revenue Code (e.g., sec. 265).

While the foregoing regulations do not specifically resolve the issue presented, they certainly underscore the fact that the statute provides for two categories of deductible expenses, i.e., "investment expenses" and apportionable "general expenses," and strongly suggest, through the examples offered, that different criteria apply to each. Indeed, by describing "investment expenses" as expenses exclusively incurred in connection with investment activities, and then, by contrast, including as "general expenses" those salaries paid for services rendered in several departments of the company, the regulations assume that general expenses are not directly related to investment income.

The courts have also recognized the substantive difference between "investment expenses" and "general expenses" as those terms are used in the statute. In *Farmers Life Insurance*

---

[19]In his trial memorandum, respondent asserted that the Ohio franchise tax is not a sec. 162 expense, but, rather, is an expense dealt with and deductible under a specific provision of the Internal Revenue i.e., Code, sec. 164. In *Bayou Verrett Land Co. v. Commissioner*, 52 T.C. 971 (1969), affd. in part and revd. in part on other issues 450 F.2d 850 (5th Cir. 1971), this Court held that taxes, though specifically allowable under sec. 164, could also be deducted under sec. 162 if they constitute an ordinary and necessary business expense. Clearly, petitioner's payment of a franchise tax qualified as an ordinary and necessary expense of carrying on its business in Ohio.

*Co. v. Commissioner*, 27 B.T.A. 423 (1932), revd. without opinion 77 F.2d 995 (10th Cir. 1935), one of the many issues was whether various expenses including postage, printing, stationery, telephone and telegraph charges, discounts on collections, and home office traveling expenses, were deductible under section 245(a)(5) of the Revenue Act of 1924, the predecessor of section 804(c)(1).[20] The Board of Tax Appeals, in a reviewed opinion, held that since these expenses were attributable to both the taxpayer's investment and underwriting activities, an allocable portion thereof was properly deductible as "general expenses assigned to investment expenses."

In *New World Life Insurance Co. v. United States*, 88 Ct. Cl. 405, 26 F. Supp. 444 (1939), affd. per curiam 311 U.S. 620 (1940), the Court of Claims was faced with the question of whether an allocable portion of the salaries paid by the taxpayer to certain employees (general officers and cashiers) for services performed by them in both the investment and underwriting departments constituted fully deductible "investment expenses" or "general expenses assigned to or included in investment expenses" under section 203(a)(5) of the Revenue Act of 1928. In its opinion, the court emphasized that expenses of a life insurance company generally fall into three classes: (1) Underwriting expenses, which are those expenses directly relating to and wholly incurred in the underwriting department; (2) investment expenses, which are those expenses directly and entirely relating to the investment department; and (3) general expenses, consisting of all expenses which are neither underwriting nor investment expenses. The court held that since the salaries were not actual investment expenses, but, rather, were general expenses assignable in part to the investment department, no portion thereof could be deducted in excess of the limitation provided by the statute.

In *Volunteer State Life Insurance Co. v. Commissioner*, 110 F.2d 879 (6th Cir. 1940), revg. 35 B.T.A. 491, the taxpayer entered into separate employment contracts with its president

[20]Except for the amount of the limitation specified therein, the language of sec. 804(c)(1) has essentially remained the same since the first "investment expense" provision was enacted in 1921.

and treasurer, one for general, and the other for investment services. The contracts were based upon estimates made of the amount of time such officers would devote to each service in the following year. During the year in issue, the officers supervised the operation of the investment department, passed on all loans, directed real estate sales, and made decisions concerning the purchase and sale of securities. In that year, each officer received two checks monthly, representing payment for general and investment services. The taxpayer deducted the latter as investment expenses under section 203(a)(5).

Relying upon the reasoning and analysis of the Court of Claims in *New World Life*, the Sixth Circuit observed that "investment expenses" under the statute included only actual investment expenses for the year, that is, expenses directly relating to and entirely incurred in the operation of the investment department. The court stated that since the taxpayer failed to prove the salary payments designated for investment services were, in fact, direct investment expenses, it held that such payments only constituted "general expenses" subject to the statutory limitation.

Finally, in *Liberty National Life Insurance Co. v. United States*, an unreported case (N.D. Ala. 1976, 39 AFTR 2d 540, 77-1 USTC par. 9107), the taxpayer placed advertisements in newspapers, trade magazines, brochures, calendars, and on road signs along highways and near schools. Some of the advertisements were designed to inform the public of the company's existence and general business, without mentioning any specific insurance policies or plans, while others were used to give pertinent facts and financial information about the company, including its involvement in community projects. The taxpayer deducted a portion of these advertising costs as "general expenses" assigned to the investment department. The Government claimed that such costs were not deductible under section 804(c)(1) because the advertisements were intended solely to promote the sale of insurance and produced no benefit for the investment department.

The District Court disagreed with the Government's contention. It reasoned that taxpayer's expenses were in the nature of "institutional" or goodwill advertising which served to enhance its public recognition and benefited all departments

of the company. Accordingly, it held that such expenses were "general expenses," a portion of which was chargeable to investment expenses.

From a close examination of each of these cases, it is clear that the particular expenses involved therein were not directly related to the production of investment income. But even more importantly, the courts did not require a direct relationship in order to deduct such "general expenses" under section 804(c)(1) and its precursors. In fact, the only requirement apparently imposed by those courts was that general expenses must be apportionable in part to the investment end of the company's business.

These authorities notwithstanding, respondent argues that we should view investment expenses, including those general expenses assigned thereto, as analogous to trade or business expenses under section 62. Relying on language contained in both section 1.62–1(d), Income Tax Regs., and the committee reports accompanying the enactment of section 62, respondent concludes that since only those State taxes directly attributable to trade or business income are deductible in arriving at "adjusted gross income," a similarly direct relationship is needed in order to deduct such taxes as investment expenses. We disagree.

The purpose of section 62 is to establish an intermediate measure known as "adjusted gross income" which is used in determining the taxable income of individuals. Sec. 1.62–1(a), Income Tax Regs. This concept, however, has no counterpart in the taxation of corporations in general, and of life insurance companies in particular. In addition, the regulations under section 804 only require deductible investment expenses to be ordinary and necessary expenses within the meaning of section 162, thereby including expenditures both directly and proximately connected with business income. Sec. 1.162–1(a), Income Tax Regs. Consequently, if there is any analogy at all between the expenses allowable under sections 62 and 804(c)(1), and, frankly, we fail to see any, it is restricted to

those direct expenses of the investment department that are deductible in full.[21] But since petitioner in this case has never claimed the franchise tax qualified as a direct investment expense, respondent's analogy is wholly unpersuasive.

There is still another important reason, however, for rejecting respondent's analogy to section 62. Briefly stated, we are concerned here with a specific section of the Internal Revenue Code, section 804(c)(1), which is applicable solely in the context of life insurance company taxation. Indeed, the legislative history underlying the enactment of the Revenue Act of 1921, where this statute first appeared, plainly reveals that such provision was drafted upon the recommendation of the life insurance companies themselves, and, in language peculiar to that industry. See Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 89–90 (1921); see also *New World Life Insurance Co. v. United States, supra* at 455–456. Under these circumstances, respondent's attempt to construe section 804(c)(1) by analogizing to a completely unrelated provision of the Code can only be viewed as misguided. Cf. *Service Life Insurance Co. v. United States,* 293 F.2d 72, 77 (8th Cir. 1961).

Based on the record before us, we are unable to distinguish, for purposes of section 804(c)(1), between the franchise tax paid by petitioner and the "general expenses" in the cases previously discussed. The Ohio franchise tax, by its own terms, is imposed on a domestic[22] insurance company for the privilege of being an insurance company in Ohio. While not expressly referred to as such, it is clearly a tax on the privilege of transacting business in that State.[23] During the years in issue,

---

[21]The only limitation on the deduction of direct investment expenses (assuming no general expenses are included in investment expenses) is that they cannot reduce taxable investment income below zero. Sec. 804(a)(2).

[22]Ohio Rev. Code Ann. sec. 5725.01(D) (Page), provides, in pertinent part, that "Domestic insurance compan[ies] [include] every insurance company organized and existing under the laws of this state."

[23]We reach this conclusion after examining the relevant Ohio taxing statutes. Ohio Rev. Code Ann. sec. 5733.01 imposes a franchise tax on domestic and foreign corporations for the privilege of doing business in Ohio. Pursuant to Ohio Rev. Code Ann. sec. 5733.09, however, insurance companies are expressly exempted from this general franchise tax, presumably because other taxes are already exacted from them under sec. 5725.18 (domestic insurance companies) and sec. 5729.02 (foreign insurance companies) in order to exercise their franchise. Moreover, except for the tax provided in sec. 5725.18, no other tax is imposed by the State of Ohio on insurance companies for the privilege of operating therein.

petitioner's business in Ohio consisted of conducting investment activities as well as pure insurance operations and the franchise tax was, in fact, levied on the income derived from both of these sources, i.e., on petitioner's "surplus." Thus, although the tax was not directly and exclusively related to investment income, it was certainly attributable to the investment part of petitioner's business and should be considered a "general expense" within the meaning of section 804(c)(1).[24]

Respondent maintains, however, that the Ohio franchise tax is in reality a tax on premium income subject to a limitation based on "surplus" and, therefore, no portion thereof is allocable to investment expenses. We disagree.

The Ohio franchise statute on its face unambiguously provides that domestic insurance companies are taxed according to the lesser of two amounts: their capital and surplus or $8\frac{1}{3}$ times the gross premiums received on risks in Ohio, less return premiums and considerations for reinsurance. Thus, premium income is but one of the alternative bases for measuring the tax, and neither base is a limit on the other. Moreover, there is nothing in the statute, its legislative history, or Ohio case law which contradicts the plain language of that provision and which could possibly support respondent's strained reading thereof. If, as respondent suggests, the intent of the Ohio legislature in enacting this statute had been to levy a tax on premium income alone, we believe it would have so provided. That this was not its intention is clearly illustrated by the fact that an annual franchise tax is imposed on foreign insurance companies, pursuant to Ohio Revised Code Annotated sections 5729.02 and 5729.03 (Page), based solely on a percentage of gross premiums originating in the State. See *Reserve Life Insurance Co. v. Bowers,* 119 Ohio App. 251, 196 N.E.2d 114 (1963). For all these reasons, we must reject respondent's argument.

Our conclusion that a portion of the Ohio franchise tax paid

---

[24]In *Liberty Life Insurance Co. v. United States,* 594 F.2d 21 (4th Cir. 1979), the Fourth Circuit suggested, by way of dicta, that a fee paid to a State for the privilege of doing business there might be deductible as an apportionable general expense where such fee was "genuinely unsusceptible of allocation to any particular part of the life insurance company's business." A similar comment was made by the Court of Claims in *New World Life Insurance Co. v. United States,* 88 Ct. Cl. 405, 435 n. 11, 26 F. Supp. 444, 459 n. 11 (1939), affd. per curiam 311 U.S. 620 (1940).

by petitioner is deductible under section 804(c)(1) is also supported by the legislative history and underlying policy of this section.

In discussing the proposed plan for taxing life insurance companies later embodied in the Revenue Act of 1921, Dr. T. S. Adams, Tax Adviser to the Treasury Department explained that: "Taxes that *go along* with their investment business are properly deductible. The taxes that may be set over against premium income are not deductible." (Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 90 (1921). Emphasis supplied.) The congressional committee reports accompanying that act stated in more general terms:

> The provisions of the present law applicable to life insurance companies are imperfect and productive of constant litigation. Moreover, the taxes paid by life insurance companies under the income tax are inadequate. It is accordingly proposed in lieu of all other taxes to tax life insurance companies on the basis of their investment income * * * with *suitable deduction for expenses fairly chargeable against such investment income.* * * * [H. Rept. 350, 67th Cong., 1st Sess. (1921), 1939–1 C.B. (Part 2) 168, 178. Emphasis supplied. S. Rept. 275, 67th Cong., 1st Sess. (1921), 1939–1 C.B. (Part 2) 181, 195.]

Furthermore, in the House Ways and Means report submitted with respect to the Life Insurance Company Income Tax Act of 1959, it is stated:

> In phase 1, the first step is to determine gross investment income. Gross investment income consists of interest, dividends, rents, royalties, etc., net short-term capital gains (after 1958), and income from the operation of a trade or business (other than an insurance business). Against this gross investment income, *deductions are allowed for investment expenses * * * and similar expenses which are attributable to the investment income. * * ** [H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 736, 742. Emphasis supplied. See also S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 780.]

While these various legislative pronouncements may differ in their terminology, they all clearly evidence congressional intention to allow deductions for those investment expenses related to investment income. See *Rockford Life Insurance Co. v. Commissioner*, 292 U.S. 382 (1934). Thus, where an expense is unrelated to investment income, no deduction will be allowed and the courts have so held, e.g., *Liberty Life Insurance Co. v. United States*, 594 F.2d 21 (4th Cir. 1979) (South Carolina granted license fee based on 2 percent of total

premium income not deductible under sec. 804(c)(1)); *Union Central Life Insurance Co. v. Commissioner*, 89 F.2d 969 (6th Cir. 1937) (commissions paid on the sale of real estate were related solely to capital gains and, therefore, not deductible investment expenses); *American General Insurance Co. v. United States*, an unreported case (M.D. Tenn. 1973, 32 AFTR 2d 5808, 73–2 USTC par. 9732) (payment by insurance company of State property tax imposed on stock owned by its shareholders not deductible as an investment expense).

On the other hand, there is nothing in the relevant legislative history to indicate that deductions for "general expenses assigned to or included in investment expenses" are limited to those directly related to such income. Indeed, such a requirement would in effect render the "general expense" portion of the statute meaningless. That is to say, if the only general expenses deductible under section 804(c)(1) are those bearing a direct connection with investment income, the statute would, for all practical purposes, contain only one category of investment expenses, to wit, actual investment expenses deductible without allocation. Since it is a cardinal rule that a statute should be construed so that effect is given to all its provisions and that no part will be inoperative, superfluous, void, or insignificant (2 J. Sutherland, Statutory Construction, sec. 4705, p. 339 (1943); see *General Motors Acceptance Corp. v. Whisnant*, 387 F.2d 774, 778 (5th Cir. 1968)), respondent's statutory argument in this case cannot be sustained.

In this connection, we must also emphasize that it is the function of the phase I computation of "life insurance company taxable income," of which section 804(c)(1) plays a part, to ascertain the company's taxable investment income, as contrasted with its underwriting income. Consequently, we believe it is entirely consistent with the overall scheme of the 1959 Act to allow deductions for all expenses both directly (actual investment expenses) and indirectly (general expenses) related to investment income, limited only by the condition that general expenses be properly allocable to investment expenses.

Finally, the decision in *Great Southern Life Insurance Co. v. Commissioner*, 89 F.2d 54, 57 (5th Cir. 1937), affg. 33 B.T.A. 512 (1935), cert. denied 302 U.S. 698 (1937), relied on by respon-

dent, does not require a contrary result. In that case, the Fifth Circuit held that a Texas personal property tax was not a deductible investment expense under section 203(a)(5) of the Revenue Act of 1928. We have carefully reviewed the opinion in *Great Southern Life*, but do not find the holding or rationale controlling with respect to the deduction of the Ohio franchise tax. Although there is some broad language in the concurring opinion of the case which could possibly support respondent's contention, we are not persuaded by the views expressed therein.

Having determined that some portion of the Ohio franchise tax is deductible under section 804(c)(1), we must now decide whether petitioner allocated a proper amount of the tax to investment expenses. For each of the years 1972, 1973, and 1974, petitioner made this allocation using a ratio of gross investment income to total gross income. Respondent argues that the allocation should be based on the ratio of "General Investment Expenses" to "Total General Expenses," as those respective amounts are reported in the annual statements filed by petitioner with the Ohio insurance departments.

Neither the Code nor the regulations under section 804 prescribe the manner by which general expenses are to be apportioned between the investment and underwriting departments of a life insurance company. Several of the leading commentators in the field of insurance company taxation, however, have discussed various methods of making this allocation. Thus, in G. Lenrow, R. Milo & A. Rua, Federal Income Taxation of Insurance Companies (3d ed. 1979), it is suggested at page 279 that such allocations should be made with reference to the nature of the expense involved and its relationship to the investment activities of the company. Guided by this standard, the authors give examples of appropriate methods for allocating specific general expenses to the investment department.[25] With respect to allocating State

---

[25]

$$1. \quad \text{Space} = \frac{\text{Amount of space used by investment department}}{\text{Amount of space used by company}}$$

(To allocate real estate expenses, including rent, depreciation, and taxes.)

$$2. \quad \text{Salaries} = \frac{\text{Salaries assigned or allocated to investment department}}{\text{Total salaries}}$$

taxes, the authors cite the same method employed by petitioner in this case.

While we are certainly not obligated to accept the advice of "experts" regarding the tax treatment of a particular transaction, we nevertheless believe that the method suggested by those commentators and adopted by petitioner in this case was appropriate. In our opinion, since the franchise tax was computed as a percentage of petitioner's surplus which, as respondent admits, consisted of both investment and underwriting income, it was reasonable to allocate such tax between the investment and underwriting departments on an income basis. By contrast, respondent's proposed allocation used a ratio of general expenses derived from petitioner's annual statement. However, the annual statement is merely a financial reporting and accounting document used solely for examination and audit by State insurance departments. Thus, the items listed thereon as general expenses for accounting purposes are not the same as the "general expenses" which are the subject of allocation under section 804(c)(1). For the foregoing reasons, we hold that the amount of the Ohio franchise tax allocated by petitioner to investment expenses was properly deducted on its returns for 1972, 1973, and 1974.

The second issue for decision is whether the 130 acres of unimproved land surrounding petitioner's home office build-

---

(To allocate Social Security and other payroll taxes, contributions for benefit plans for employees, and other employee welfare.)

3. Number of personnel $= \dfrac{\text{Number of personnel in investment department}}{\text{Total number of personnel}}$

(To allocate certain classifications of salaries, contributions for benefit plans for employees, and other employee welfare.)

4. Time spent $= \dfrac{\text{Time spent on investment activities}}{\text{Time spent on all activities}}$

(To allocate certain classifications of salaries, equipment, and data processing expenses.)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

6. Cost studies—percentage arrived at through experience, judgment (for certain classifications of salaries, postage, telegraph and telephone, printing and stationery, and many others), etc.

ing is includable in the "assets" pursuant to section 805(b)(4). Under the statutory formula for taxing life insurance companies, the effect of including this land in assets would be to decrease the policyholder's share of investment yield and hence increase the company's phase I tax base.[26]

Section 805(b)(4) defines "assets" as all assets of a life insurance company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. The pertinent regulations set forth the only items to be excluded from the term "assets" because they are considered used by the company in carrying on an insurance business. Sec. 1.805–5(a)(4)(i), Income Tax Regs. Among the items enumerated therein is "the home office and branch buildings (including land) owned and occupied by the life insurance company."

Petitioner argues that the entire 189.2-acre tract of land purchased in 1958 as a home office site should be excluded from its "assets" pursuant to section 805. To support this position, petitioner maintains that it acquired such property for business purposes, namely, to provide a pastoral setting and recreational area for its employees, to protect against unwarranted and undesirable encroachment, and for future expansion of its physical plant. In petitioner's view, since the land was originally acquired for the intended use of its business, it remained property "used by it in carrying on an insurance trade or business" during 1972, 1973, and 1974.

Respondent, on the other hand, concedes that the 60 acres of land containing petitioner's home office building, access roads, parking lots, and landscaped property are excluded from the definition of "assets" under section 805(b)(4). However, respondent argues that the remaining undeveloped acreage was not used for any purpose incident to the use and occupancy of the home office building and, therefore, cannot be considered as used in petitioner's trade or business within the meaning of the statute or the regulations. On this record, we must hold for respondent.

Petitioner has simply failed to establish to our satisfaction that the 130 acres of land qualify for exclusion under section

---

[26]See note 10 *supra.*

805(b)(4). Although the land may have been acquired for the various reasons cited, petitioner did not present any evidence showing that it was used for business purposes during the years in issue. For example, while petitioner claims that providing a suitable recreational area for employees was an important factor in its decision to acquire a large tract of land, no evidence was offered to indicate the land was ever used by petitioner's employees for recreation or any other purpose. In fact, no formal recreational facilities existed on the property despite the fact petitioner had owned that land since 1958. Based on the record as a whole, we believe that this undeveloped property was held by petitioner for solely future development and not used in its insurance operations. Accordingly, respondent's determination on this issue must be sustained.

To reflect the foregoing,

*Decision will be entered under Rule 155.*